### GENERAL ELECTRIC CO. v. HARTMAN et al.

### HARTMAN et al. v. GENERAL ELECTRIC CO.

#### (Circuit Court of Appeals, First Circuit. March 2, 1911.)

#### Nos. 900, 901.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ELECTRIC SWITCH.

The Hewlett and Emmet patent, No. 800,916, for an electric switch of the oil break type, designed for use in opening and closing electric currents of high potential, the essential feature of which is the making of the oil tank independent of and easily separable from the switch, to facilitate access to the contact points and other mechanism as well as to the oil and tank for purposes of inspection and repair, discloses patentable invention of a meritorious character, and is valid; also *held* infringed.

2. PATENTS (§ 328*)—INVENTION—ELECTRIC SWITCH.

The Emmet and Hewlett patent, No. 789,597, for a high potential electric switch of the oil break type, designed to remove, or to minimize, the disadvantages and hazards which in prior arrangements were created by breaking and closing the circuit of strong currents at points which were in proximity to soot deposits in the bottom of the oil-containing vessels, discloses patentable invention and utility, and is valid.

Appeals from the Circuit Court of the United States for the District of Massachusetts.

In Equity. Suit by the General Electric Company against Frank O. Hartman and others for infringement of patents. Decree for com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plainant as to one patent and for defendants as to one, and both parties appeal. Reversed on complainant's appeal, and affirmed on defendants' appeal.

W. K. Richardson, A. D. Salinger, and Fish, Richardson, Herrick & Neave, for General Electric Co.

George A. Rockwell, for Hartman and others.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. The Circuit Court was concerned with a single bill in equity in which the complainant set up three patents: One to Hewlett and Emmet, dated October 3, 1905 (800,916), another to Emmet and Hewlett, dated May 9, 1905 (789,597), and another to Badeau, dated November 25, 1902 (714,436), all of which relate to high-potential switches designed for use in opening and closing an electric current, and they all have reference to switches or circuit breakers of the oil break type.

In the Circuit Court, claims 1, 2, 4, and 8 of patent 800,916, which was called the first patent, were held valid and infringed, while patent 789,597, called the second patent, though of a lower number, which was for a supposed improvement upon 800,916, was held invalid, and the same result was reached in respect to the Badeau patent.

Neither party raised any question against the result reached below in respect to the Badeau patent, but the complainant, the General Electric Company, appealed from that part of the decree below which holds patent 789,597 invalid, and assigns as error that the court erred in that respect, as well as in refusing to order an injunction and an accounting, while the defendants appealed from that part of the decree which sustained claims 1, 2, 4, and 8 of the patent No. 800,916, directing their assignment of errors against that part of the decree as well as against the order for a perpetual injunction.

The complainant's appeal is No. 900 in this court, and that of the defendants is 901, and the two were heard as one case.

[1] We will first consider the appeal of the defendants which directs itself against the result reached in respect to the earlier patent which is numbered 800,916. We do not understand that any claim is made that this patent covers mechanism designed for breaking electric currents under insulating liquid. That idea was old, and different kinds of switches were commonly employed under oil. Therefore, while the invention, if there is any, relates to the art of emersing or smothering the arc, or the live parts, of high-potential switches in oil as an insulating liquid, it is not claimed, as we understand it, that the invention resides in any conception in that respect, or in any particular mechanism to that end, but rather in a new conception and mechanical arrangement of parts which made the oil tank independent of, and easily separable from, the switch, to the end that access might easily and quickly be had to the contact points and other important and crucial mechanisms, and to the oil, and the inner walls of the oil tank, for frequent and necessary purposes

of inspection and repair. Such easy and quick access was deemed to be specially important because, under the heavy duties of the switch and the ravaging effects of electrical currents of high potentials, the oil is burned and carbonized and its insulating quality seriously impaired, and the reliability of the switch lessened through its mechanism being put out of repair by the charring effects of the arc on the oil, and through the burning away of contact points with possible electrical disturbance. As a result of this, it is quite apparent that frequent access was important for cleansing and repairing purposes.

To safeguard against the dangers of arcs in the air under high voltage, it was an imperative necessity to surround the arc with an insulating medium, and it seems agreed that oil most effectively furnishes the safeguard. All this, however, in respect to oil is old, and it has no particular pertinency here except with reference to the fact that in operation and through its use as a medium there result disturbed conditions which require frequent inspection and relief.

Prior to the patent in question (800,916) the switch was ordinarily mounted in a tank or vessel which was to contain the oil, and the fixed contacts were ordinarily, if not always, placed on some kind of an insulating support secured in the vessel which was to be filled with oil, thus submerging the live mechanisms. In order to get at the parts and make the required inspection, cleansing, and repairs, it was necessary to siphon out the oil and disassemble the switch mechanisms.

Hewlett and Emmet conceived the idea of breaking up such an assembly of elements and of supporting the switch independent of the insulating device, and of bringing into operation, and of applying, the insulation as an entirely independent and easily detachable feature. To do this they point out means for independently mounting the switch under a scheme which would permit the oil vessel to be passed up from below, under conditions which submerge the live parts of the switch, and with attachments which permit of quick and easy removal.

After a thing of this kind is accomplished, the point of view makes it seem a simple contrivance, but, in dealing with the question of invention, the essential view is from the state of the art existing at the time the necessary problem was sought to be solved. It must not be forgotten that Hewlett and Emmet were dealing with mechanical elements to be used in connection with high-potential electric currents, and particularly such devices as are employed in central or distributing stations for handling currents of large amperage, and they say that:

"In carrying out the invention we mount upon an insulating-support, such as a switchboard, a frame carrying fixed and movable circuit-terminals and inclose the latter in a movable pot or well of oil or other insulating liquid and provide means for rocking the circuit-closing contact into operative relation to a desired set of terminals.

"The invention embodies various structural features, the novelty of which will be hereinafter fully described and will be definitely indicated in the claims."

In dealing with this patent the learned judge of the Circuit Court said:

"Hewlett and Emmet for the first time conceived the idea of supporting the switch quite independently of the tank so that the tank could be detached from the switch merely by unfastening the former. In other words, the oil-submerged switch necessarily consists of two parts, the operative switch and the comparatively inert oil tank. Before Hewlett and Emmet these parts had been so connected that their separation, though often necessary, was difficult and lengthy. Hewlett and Emmet made separation easy and rapid without affecting the operation of the switch as a switch, of the oil as oil, or of the tank as a tank. Except as to arcing, the switch worked much as if it were in the air, and in the claims here in suit no invention is suggested in the organization of the switch as a switch. But I find patentable invention of a meritorious sort in the easy separation of the parts of the working device."

We think there was invention, and we are satisfied with the foregoing statement as to its scope, validity, and merit, and we do not find anything in the record or the arguments which at all disturbs the reasoning or the conclusion of the learned judge in respect to the merit of the patent in question (800,916), or the result reached upon the question of infringement.

We now come to patent 789,597, which is urged as covering an improvement upon 800,916.

[2] It must not be forgotten that Hewlett and Emmet, recognizing the utility of oil as an insulating medium in connection with high-potential switches, also recognized the fact that in its use certain disturbing conditions are created which require frequent attention and relief, and that their invention, covered by patent 800,916, was not at all directed to the idea of a minimization of the disturbing conditions, but to the sole idea of furnishing free and easy access to the critical points for the purpose of relieving and repairing the disturbed conditions.

While this is true of the invention of patent 800,916, the later patent (789,597), the one now under consideration, sought to deal with an entirely different proposition, that of minimizing the disturbing conditions to which the earlier patent only sought to give free access for purposes of removal and relief. This is made clear by the specification of the later patent which recites among other things that:

"This invention relates to high-potential switches or circuit-breakers of the oil-break type, in which the circuit is ruptured at contact points under an insulating fluid. In the construction of switches of this type oil is commonly employed as the medium in which the circuit is opened and is well adapted for the purpose, both on account of its high insulating properties and by reason of its liquid character, by reason of which it closes in around the points of contact across the arc and serves to condense and mechanically displace the arc-vapors and fill the space with a medium of high insulating power. The employment of oil, however, is accompanied by some disadvantages, one of which is the carbonization of the oil and the deposit of soot on the terminals and adjacent parts. When the circuit is opened, the small arc formed reduces some of the oil, setting free the basic carbon in the form of fine particles, which float in the oil and gradually agglomerate and form deposits on the terminals and adjacent parts, which unless removed interfere with the operation of the switch."

After thus describing the disturbing influences and the disadvantages of oil insulation, the specification then points out a part of the object of the supposed invention in the words following:

"It is the object of one part of our invention to avoid this difficulty, to which end we proceed by mounting the movable element of the switch or circuit-breaker so that in opening the circuit it takes a downward movement in the oil, thereby effecting the contact on the under surface of the fixed terminal, which will be rendered self-cleaning by the engagement of the parts and from which the carbon will fall and settle in the bottom of the containing vessel. Another advantage incidental to this organization is that by reason of the downward movement of the movable contact the arc lengthens or is stretched through a progressively-increasing depth of liquid, thereby subjecting the arc stream to an increasing pressure and also giving the insulating vapors developed a longer path to travel in the cool liquid before reaching the air. This results in a decreased fire hazard, since it sometimes happens that the vapors liberated by the heat of the arc escape in sufficient volume to reach the top of the containing vessel and may be ignited there."

It is quite clear from the above description of the object of the invention that the leading idea was to remove, or at least minimize, the disadvantages and hazards which, in the older arrangements, were created by breaking and closing the circuit of strong currents at points which were in proximity to soot deposits in the bottom of the oil-containing vessels. In other words, the problem involved dealing with forces, rather than to give access to disturbed conditions which the forces create.

We assume that any conception and device which furnishes means for removing even slight interferences with the successful operation of the high-potential switch as a contrivance for controlling powerful and dangerous currents of electricity, and which in any degree, however slight, lessens fire hazard, presents an important improvement in the field of art pertaining to the use of electricity.

The learned judge of the Circuit Court, apparently recognizing some measure of improvement in the switch described in the patent under consideration, turned the case against invention upon the point that the improvements might have reasonably resulted from the exercise of ordinary mechanical skill, and to sustain such view made a careful analysis of the elements and their mechanical interrelations.

If, on the question of invention, it were permissible to presuppose, or assume, the conception of relieving from the disadvantages and dangers, with which the art was confronted, through carrying the contact points of the switch to the upper and cleaner oil of the well to the end that the carbon should fall and settle in the bottom, thereby making the terminals and adjacent parts less liable to be put out of use by the carbon deposits, and as a result that the contact points of the switch will do better work, and if it were permissible to pre-suppose that lengthening the arc by stretching it through a progressively-increasing depth of liquid would subject the arc stream to an increase of pressure, and that thus giving developed insulating vapors a longer path to travel under pressure in cool liquid before reaching air, would lessen the fire hazard, we should agree that it is quite possible, and perhaps probable, that ordinary mechanical skill would have furnished the means for accomplishing the desired results. If

a skilled mechanic were given the conception and the idea, it is possible that he might work out a result, but that, it would seem, is not the correct point of view. We must look at the situation as it existed prior to the conception which suggested or promoted the beneficial mechanical arrangement.

A leading and essential feature of the means is the movable element of the switch or circuit-breaker, which, in opening the circuit, takes a downward movement in the oil from the under surface of the fixed contact terminal. The movable part of the switch is actuated by the instrumentalities of a system of bell-crank levers, a toggle, and various other mechanical details. But the mechanical problem of adapting the means is not the inventor's whole case. The question of invention involves a broader problem than that relating to the mechanical means. The inventor, knowing the disadvantages and dangers resulting from the use of oil in connection with high-potential electrical switches, conceived the idea of relieving, in a measurable degree, the conditions and situations which created and promoted the known disadvantages and dangers.

The idea of accomplishing necessary results naturally preceded all questions as to assembling and adapting means; and questions as to the better effect of electrical contact in the upper part of the oil bath where the oil is cleaner—questions as to carbon producing dangers, floating particles in the oil gradually agglomerating and forming deposits on the terminals, which being disengaged, by breaking and closing the circuit, fall and settle in the bottom of the tank—questions as to the effect of lengthening and stretching the arc, through the downward movement of the movable contact, under oil and under increasing pressure—questions as to the effect of forcing developed insulating vapors to a longer travel in cool liquid before reaching air—are not questions, as we view them, for the ordinary skilled mechanic, but questions which enter into the broader inquiry whether the art is advanced through an inventive idea which suggests and provides a better and safer use of an exceedingly dangerous force.

The inventive idea was not so much in the arrangement of mechanical means as in appreciating the difficulties and necessities, and in conceiving and pointing out how to deal favorably and beneficially with the forces involved.

The patentees not only furnished the idea of minimizing the disadvantages and dangers incident to electrical switch operations which have to do with powerful currents under oil, but they devised means for accomplishing the results through a more compact and simplified organization of appliances than any existing in the prior art.

The case is not especially strong upon the ground of fire hazard, but the evidence, on the whole, satisfies us that there is an element of fire danger in the older device resulting from the deposit of carbon upon the woodwork of the supports.

It is claimed that the contact points of this patent, in themselves, and as they are mechanically operated, present improvements on the earlier patent, and we think they do. On the whole, we think there was patentable invention, and when we consider the concep-

tion, as amplified by the specification, and in connection with the adaptation of means described for working out the results, we see no reason why the invention is not within each of claims 1, 5, 6, 7, 8, 9, 10, and 14.

As the court below did not deal with any question of infringement under the second patent, there is no general question of that kind before us, nor is there any question of infringement in respect to any particular claim.

So much of the decree of the Circuit Court as relates to patent No. 800,916, is affirmed, and that part which relates to patent No. 789,597 is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs in this court to the General Electric Company.