UNITED ELECTRIC CO. v. CREAMERY PACKAGE MFG. CO. et al.

(District Court, E. D. Wisconsin. June 9, 1916.)

PATENTS ⊕⊃328—VALIDITY AND INFRINGEMENT—VACUUM CLEANER.

The Dillon reissue patent, No. 13,352 (original No. 1,005,005), for a vacuum cleaner, although for an improvement on a prior device and comprising a combination of old elements, discloses patentable invention, in that it rendered the prior device for the first time efficient and workable; also held infringed.

In Equity. Suit by the United Electric Company against the Creamery Package Manufacturing Company and others. On final hearing. Decree for complainant.

See, also, (D. C.) 203 Fed. 53.

Complainant, owner of Dillon reissue patent 13,352, dated January 9, 1912, for improvement in vacuum cleaners, charges defendant with infringement.

The invention, as disclosed in the specification and claims, is as follows:

## Specification.

"The invention relates to vacuum cleaners including an electric motor, a suction fan, and a separating-chamber communicating with a plurality of inlet-openings adapted to communicate with the tubular shanks of suction-nozzles. Such machines are designed and sold for the use of one or two or some other particular number of suction-nozzles at the same time, and it is desirable for practical reasons to construct the fan with a greater capacity than necessary to create the proper suction in the shanks of the particular number of nozzles which may be used; and it is also desirable for economy to make the motor with only a little greater capacity than necessary to create such suction. In the operation of these machines difficulty has been experienced when more than the particular number of inlet-openings have been purposely or accidentally used or opened at the same time, growing out of the fact that the work of the fan and the load on the motor will be so increased as to burn out the motor. This difficulty is overcome by providing a partition between the fan chamber and the inlet-openings with an orifice therein of substantially the same cross-area as the combined cross-areas of the openings in the particular number of suction-nozzles which may be used, thus limiting the amount of air which can be drawn into the fan to the amount of air which may properly be drawn through the shanks of such particular nozzles.

"The invention thus described as embodied in a stationary vacuum cleaner is illustrated in the accompanying drawings, forming part thereof.

"Figure 1 is a side elevation of the vacuum cleaning machine, with some parts broken away to show interior details; and figure 2 an elevation section of the electric motor, the fan blower, and the upper part of the separating-chamber.

"Similar numerals refer to similar parts throughout the drawings.

"The machine includes the separating-chamber 1 within the cylindric case 2, the fan chambers 3 within the blower case 4, and the fan 5 located in the fan chamber and secured on the lower end of the spindle 6 of the electric motor 7 which is secured on the blower case.

"The inlet-opening 8 of the collecting-chamber is provided in the cylindric case 2, and communicates with the main conduit 9, which is preferably extended inward or adjacent to the wall of a building (not shown), and is provided with a plurality of inlet-openings 10 normally closed by the valves 11, for use in cleaning the various apartments of the building. One or more suction-nozzles, as 12, are provided, and the tubular shanks 13 thereof are preferably extended as by the tubular handle 14 and the flexible

*Fig. 2.*

tube *15*, and the free ends of the flexible tubular extensions are adapted to be entered into or otherwise connected with one of the inlet-openings *10* when the valve thereof is open or removed, whereby the nozzle communicates with the collecting-chamber through said conduit.

"The cross-areas as at $x-x$ of the opening in the shank of each nozzle is suitably proportioned to the area of the opening of the inlet slot *12a* of the nozzle to properly perform the work thereof, and substantially the same size of opening prevails throughout the nozzle-shank, the tubular extensions thereof, and the communicating inlet-opening. The cross-area as at $y-y$ of the main conduit is preferably made much larger than the combined cross-areas of the openings in the particular number of nozzle-shanks designed to be operated at one time, which enlargement is made for the purpose of decreasing the resistance and friction caused by the flow of air through the main conduit, the same being generally extended a considerable distance from the machine to the various inlet-openings. For the purpose of reducing frictional resistance in the fan *5* at the speed adopted for operating the machine, the same is likewise made considerably larger in capacity, that is, the peripheral outlet slot *16* is widened to make a considerably larger outlet area than the combined areas of the openings in the shanks of the particular number of nozzles to be used at the same time; and this slot is so widened for the further purpose of freely passing articles of refuse which may be drawn through the fan, and which would otherwise lodge in and clog the slot. And the motor *7* is designed and adapted to normally rotate the fan at the adopted rate of speed, and as such speed of rotation to properly perform the work necessary to create the proper vacuum or suction in the tubular shanks of the particular number of nozzles which may be properly used.

"The orifice *17* which constitutes the inlet to the fan chamber is provided in the partition separating this chamber from the collecting-chamber, and, for the purpose of this invention, the cross-area, as at $z-z$ of this orifice, is made substantially equal to the combined cross-areas of the openings of the particular number of nozzles designed to be used at one time, so that the fan can only take in the amount of air which properly passes through the shanks of such particular number of nozzles, and therefore the capacity of the motor cannot be overloaded to injure or to burn it out."

### Claims.

"1. A vacuum cleaner including a separating-chamber having a plurality of valved inlet-openings communicating therewith, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the separating-chamber and

the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks.

"2. A vacuum cleaner including a separating-chamber having a plurality of valved inlet-openings communicating therewith, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the inlet-openings and the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks.

"3. A vacuum cleaner including a separating-chamber with a communicating conduit having a plurality of valved inlet-openings therein, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the separating-chamber and the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks.

"4. A vacuum cleaner including a separating-chamber with a communicating conduit having a plurality of valved inlet-openings therein, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the inlet-openings and the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks.

"5. A vacuum cleaner including a separating-chamber with a communicating conduit having a plurality of valved inlet-openings therein, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the separating-chamber and the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks. the cross-area of the conduit being greater than the combined cross-areas of said particular number of nozzle-shanks.

"6. A vacuum cleaner including a separating-chamber with a communicating conduit having a plurality of valved inlet-openings therein, suction-nozzles having tubular shanks adapted to be connected with the inlet-openings, a suction fan having a capacity greater than that required for the combined cross-areas of a particular number of nozzle-shanks, a motor connected with the fan having a capacity substantially equal to the requirements of said particular number of nozzle-shanks, and a partition between the inlet-openings and the fan having an orifice therein with a cross-area substantially equal to the combined cross-areas of said particular number of nozzle-shanks, the cross-area of the conduit being greater than the combined cross-areas of said particular number of nozzle-shanks.

"7. A vacuum cleaner including a separating-chamber having a nozzle conduit communicating therewith, a suction fan adjacent to the chamber with an intervening partition having a communicating orifice therein, and a motor in operative connection with the fan; the conduit and the fan being of greater capacity than the motor, and the size of the orifice being proportioned to the capacity of the motor.

"8. A vacuum cleaner including a nozzle conduit, a suction fan having a case with an inlet orifice in communication with the conduit, and a motor in operative connection with the fan; the conduit and the fan being of greater

capacity than the motor, and the size of the orifice being proportioned to the capacity of the motor.

"9. A vacuum cleaner including a separating-chamber, a suction fan and a motor in operative connection, there being a partition having a communicating orifice between the chamber and the fan; the fan being of greater capacity than the motor, and the size of the orifice being proportioned to the capacity of the motor.

"10. A vacuum cleaner including a suction fan having a case with an inlet orifice therein, and a motor in operative connection with the fan; the fan being of greater capacity than the motor, and the orifice being proportioned to the capacity of the motor."

Harry Frease, of Canton, Ohio, and Erwin & Wheeler, of Milwaukee, Wis., for plaintiff.

Luther L. Miller, Charles C. Linthicum, and Lincoln B. Smith, all of Chicago, Ill., for defendants.

GEIGER, District Judge (after stating the facts as above). The parties are agreed that, whatever may appear in the art or industry of vacuum or pneumatic cleaning, no substantial successes had been achieved until the advent of the Kenney patent, 847,947, issued in 1907, upon application filed in 1901. This concurrence finds further support in the view taken, upon consideration, by the House of Lords, of Booth's British patent, issued in 1901. The general survey of the art as found in the opinions filed in the latter case, is helpful in determining the scope of the present inquiry so far as it concerns the patentable novelty, or the quality of Dillon's structure. Thus it is observed:

"It is admitted that under the patent [Booth's], the extraction is satisfactory and thorough, and that while other persons, including the patentee, had been attempting to solve the problem of the complete removal of dust from articles like carpets, remaining in situ, all such attempts had substantially failed."

Again:

"In the present case, the attempted solution of the problem by a fan and by an ejector are very amply proven to have been inefficient, wasteful, and futile. The evidence is quite plain on that subject, and when, the problem having been thus before men's minds and a solution having been anxiously and repeatedly attempted and failed, I think, although not per se conclusive, it goes a long way to satisfy the mind as to the presence of invention, when Booth's attempt, under the patent now assailed, was accompanied by complete and satisfactory success."

Lord Mersey said:

"The claim is for a combination consisting of three things, namely, an extracting implement, a power-driven suction pump, and a dust-collecting apparatus. It is truly said that none of these three things was a novelty at the date of the patent, and it is also truly said that it required no ingenuity to place them side by side. But the evidence, I think, shows that they are not merely placed side by side, but that they are fitted and worked together in combination in such a manner as to produce one machine which is both novel and useful. * * * The combination does its work well, and the machine is admittedly a practical success. No earlier contrivance having the same object in view has been anything but a failure. This circumstance may not be conclusive, in law, in favor of the patentee, but it goes a long way to prove that there is invention. * * *"

Complainant's proofs respecting the art as developed prior and subsequently to the advent of the Kenney patent are quite elaborate, and

its contention, in brief, is: That when Goughnour (who, defendant claims, invented, if any one did, whatever Dillon claims) in 1909 disclosed his invention, there were two assumptions dominant in the endeavors of all seeking to perfect a vacuum cleaning machine: (1) That high vacuum was essential to success; and (2) that a centrifugal fan was not adequate for its production. And complainant readily concedes to Goughnour a large forward step in the art through his contribution of a new form of fan. Whether the so-called high vacuum cleaning systems produced successful machines is not, so plaintiff concedes, repugnant to the claims or merit on the part of either Goughnour or Dillon, because their endeavors were directed to avoiding deficiencies of the so-called high vacuum principle. Thus, while it is conceded that when a high vacuum is created, such vacuum and its resultant suction is extended to the nozzle, it is not maintainable at that point without expenditure of power at all time equal to exhausting from the apparatus the precise volume entering upon release of the suction. That is to say, the power to exhaust must, at all times, be present to meet the inrush of air displacing the vacuum. Now, Goughnour, in directing his effort to remedy this, devised a fan, whose general structure is now well known in the art, which is of the centrifugal type, with two converging walls forming substantially uniform air passages, and concededly having a capacity of producing a continuous movement of an air volume at great velocity through the apparatus.

So, too, in meeting the claims made by defendants, the basic contention of complainant with respect to the particular art of vacuum cleaning is that it must be distinguished from ordinary dust-collecting or pneumatic conveyors; that it combines the act of *collecting* with that of *extracting* dust and dirt from fabrics. Therefore the organization of a structure must be efficient in both these aspects. Complainant gives to Goughnour the credit of recognizing that efficiency. To meet these combined requisites depends, not so much upon the *amount* of vacuum which can be created in the apparatus, or at the operating tool or nozzle, but rather upon the *constancy* and *continuity* of a volume sufficient both for extraction and collection; that the cleaning is not produced by the quantum of vacuum pressure, but by the continuity and constancy of the volume of air passing through a fabric, or upon or along a surface to be cleaned. Complainant further credits Goughnour with a new collecting tank into whose upper part the dust-laden air is admitted, and from whose upper end the air is drawn directly into the eye of the fan, thus permitting a gravity separation of dust from the air, and thereby dispensing with filtering means; that his fan permitted the use of suction-nozzles with wider slots, tubes and hose with larger diameters than those permitted with high vacuum exhausting pumps; that the saving of power as well as the protection of electric motors in their use in the modern air-cleaning apparatus, is to be credited to Goughnour in preventing: (1) An excess of vacuum; (2) a decrease in consumption of power when the suction-nozzle is closed; (3) and the prevention of loss of power by a filtering wall, by air slipping or by frictional contact.

The efforts of Goughnour culminated, late in 1909, in the commercial development of what is known as the Goughnour power machine, and, shortly thereafter, the Goughnour Tuec machines were brought out. The ensuing year brought out 600 of these machines, and they achieved what appeared, initially, to be decided success. A reference to this period may be helpful in view of complainant's insistence respecting its bearing upon the quality of Dillon's discovery. The displacement, at this early stage, of competitors' apparatus in the market by complainants is proved; but with it is also the proof respecting the failure of the Tuec to maintain its position among users. In a great majority of instances the apparatus became crippled through the burning out of the electric motor, and as a result of this situation, imminent failure threatened complainant "because no suitable means had been discovered or devised for protecting the machine against inherent tendency to destroy itself." This seems, in the proofs, to have developed as a defect or deficiency in the Goughnour construction, and, during the year preceding Dillon's disclosure, was the occasion of close and rather unremitting experimental endeavor directed to its remedy. Thus small holes were made in the bottom of the bearing head to help ventilate the motor; the motor case was changed; slots were put in the top to afford ventilation. Later a new style of fan was devised, it was changed by closing the eye of the outer wall of such fan, and the inlet-opening in the lower wall was reduced; again, the diameter and the peripheral outlet of the fan were modified by reduction.

Now, if complainant's proofs respecting its own experience amount to anything, they support its claim that during this period Goughnour had demonstrated the feasibility of a centrifugal fan operating on a low-pressure principle, provided the machine or apparatus would stand the strain at the motor end. By this is not meant that he discovered the centrifugal fan, nor the principles of pneumatics inhering in its use. But the record here does show that his labors produced a new combination in air-cleaning apparatus.

Up to this point it may be conceded that Dillon had contributed nothing which, being in his present patent, is to *his* credit as an inventor; and defendant, to support its contention of invalidity, makes the broad claim that, beginning with 1869 (McGaffey's patent), all the elements of Dillon's claims are found in the art; the rotary fan, a separating-chamber, the vertical stand-pipe with openings, the suction-nozzles, the acknowledged status of the Kenney patents, the electric motor, and, lastly, the Goughnour fan embodied in his patent granted in 1911 upon an application filed in 1909. The defendant's conclusion is therefore thus stated in its brief:

"It thus appears that all of the actual physical elements of the Dillon construction are all old and have all been used in the prior art in the same combination and for the same purpose. *None of the prior art patents referred to, however, contains any restriction as to the relative capacity of the fan, inlet orifice, and the motor, and nothing concerning the substantial equality of the cross-area of the inlet orifice* and the cross-areas of the nozzle-shanks. So far as these vacuum cleaner patents are concerned, Dillon's contribution to the art consisted in making the inlet orifice of the fan substantially equal to the cross-areas of the nozzle-shanks intended to be used at one time so as to limit the power demand on the motor; but this was also old, old in the

vacuum cleaning art, and well known to those who were employed in installing such devices and in experimenting generally with the use of suction fans."

If, therefore, Goughnour did disclose a new organization of elements—and the proofs show that his combination was new—is Dillon entitled to recognition as an inventor for making as a minimum of contribution what the defendants concede to him? Can he claim to have produced something which was lacking when Goughnour's work was finished, and which has turned to good account all that Goughnour and his predecessors had done? The proofs, in my judgment, show that Goughnour, with all his labors, had failed to make a combination that could stand the strain of use. Whether the precise trouble was caused by clogging of the fan, by the amount of air going through the fan, or by other causes, may be indefinitely debated. The fact remains that, in all experiments made prior to December, 1910, the pneumatic principle now embodied in Dillon's patent had not been resorted to as a possible remedy for the difficulties attending plaintiff's machines in the hands of users. Nor ought it, in my judgment, to detract from the quality of Dillon's act as inventive, to point out that, despite the tribulations of plaintiff, the Sturtevant patent, issued more than 40 years ago on a centrifugal blower, may have pointed out this matter of relationship between inlet pipes and the blower opening; or that engineers in experiments had recognized the propriety of maintaining a relation between the inlet orifices and the fan capacity, because of its effect upon power consumption; or that in dust-collecting apparatus in factories, the principle had received recognition. The accomplishment of Dillon—assuming it to be no more than defendants concede it to be—is subject, justly, to recognition as inventive, within the doctrines of Air Brake Co. v. Christensen Engineering Co. (C. C.) 123 Fed. 306, Gen. Electric Co. v. Hartman, 187 Fed. 131, 109 C. C. A. 49, Toledo Comp. Scale Co. v. Computing Scale Co., 208 Fed. 410, 125 C. C. A. 622, and other cases cited by counsel. If the record here showed that Goughnour had solved the problems arising out of the breaking down of the machines; that after altering his fan construction no further trouble was experienced—a question quite different than the one before us might be presented. As it is, the record shows that Dillon's act overcame the deficiencies, and I think he is entitled to credit as an inventor, no matter how much credit may be due to Goughnour for *his* development. Were there doubt on this, the proofs respecting the success of the apparatus, its acceptability, as shown by sales, would solve such doubt.

Coming to the issue of infringement, a comparison of defendants' apparatus with complainant's, and with the patent structure, one is at first led to wonder, not how a charge of infringement is to be substantiated but rather how it can be avoided. For example, identity of suction-nozzles in respect of shape, size of slot, diameter of the shank; length, diameter, and shape of ends of tubular handles; length, diameter, structure, fittings of hose; diameter of suction tubes; the separating tank in its material structure; the size, shape of parts, diameter of exhaust pipe of the fan-casing; the size, conical shape, the

236 F.—48

width of peripheral outlet slot; the reduced inlet orifice of the fan—these as well as the size, general appearance, even as to the coat of paint, are not only established but appear on mere inspection and comparison. The differences apparent are the *shape* of the dust-collecting tank and the position given to the fan casing and the motor. Now, as I view the proofs in the case, the real and only question of infringement is that arising upon the contention of defendants, of their substantial variation from the patent structure which arises through the change attempted in the subsequent patent granted to Benbrook and Campbell. It is true that such subsequent patent is not evidence of infringement, but it is equally true that the only substantial differences claimed between defendants' and the patent, as well as plaintiff's commercial devices, are the very ones which are claimed in such later patent as disclosing the point of distinction.

By recurring to Dillon's specifications and claims, it will be observed that his point of greatest stress is the recognition and maintenance, substantially, of relations there specified, between the inlet orifice, the fan, the motor, and the nozzle openings. That the defendants recognized this, and no doubt can be entertained (in view of their relationship to the plaintiff at the time they applied for a patent) that they were speaking directly to Dillon's structure, is shown by the following excerpts from their patent specifications:

"By the above-described arrangement of adjustable sleeve in connection with the intake opening of the fan-casing it is apparent that after the apparatus is set up, by removal of the cap *16*, said throat-sleeve may be adjusted to regulate the intake opening to the fan in proportion to the number of suction-nozzles that may be used at the same time in the operation of the device. Thus the intake orifice is predeterminedly set with respect to the number of tools to be operated whereby the amount of air drawn into the fan is limited accordingly. Hence great economy in the construction of the machine is effected, due to the fact that a single machine may be designed and utilized for one or a series of suction-nozzles without special construction or variations." Lines 12 to 29, p. 2.

"We are aware that vacuum apparatus of this general character have been utilized wherein a partition between the fan-chamber and inlet-opening is provided with an orifice that is substantially the same in cross-sectional area as the combined cross-sectional area of the number of openings in the stand-pipe for attaching suction-nozzles, thus limiting the amount of air which can be drawn into the fan to the amount of air which may properly be drawn through the shanks of the particular number of nozzles. This construction requires specially designed machines in each instance for accomplishing the desired result whereby our apparatus as previously described, being arranged with an adjustable air intake without respect to the cross-sectional area of the partition in the separator, can be used for one or more suction-nozzles by a simple adjustment." Lines 43 to 63, p. 2.

It seems clear that defendants, in constructing their machines, have done the very thing which they above aim to do—not, as suggested, rejected Dillon's disclosure, but *adopted* it, and, by means of an adjustable sleeve upon the orifice and a conical projection on the fan, endeavored to evade it by claiming that through these there is a substantial departure from a fixed relation of the orifice, ascribed to Dillon. Each of the claims of their patent industriously includes, as an element, a section chamber "provided with a discharge opening and an air inlet-opening of *unrelated areas*," but couples therewith (for ex-

ample claims 1 and 6) *adjustable means*, or an adjustable *sleeve* for regulating the "flow of air through the chamber." It is my judgment that this is as palpable an attempt to merely color Dillon's disclosure as was condemned in the Tire Chain Cases. Defendants, in attempting to distinguish from the latter cases, say:

"The case at bar does not fall within that class, since the adjustment is made at the factory, and then the adjustable device is bolted up in the interior of the machine, where the purchaser *is not even aware* of its existence; and the complainant has utterly *failed to show the position of the adjustable sleeve* at the time of sale."

This amounts, in substance, to saying that the machines of defendants, as they put them out, purposely ignore exact relations taught by Dillon; that they purposely ignore proportions, but that they provide means for fixing either, as efficiency may from time to time dictate. Therefore, because the machine when put out *may not* then have fixed relations or proportions within the reading of Dillon's claims, and because the purchaser may be actually ignorant of the means provided for getting within the range of such claims, there is no infringement. This would afford an easy method of covering infringement—a complete frustration of the Tire Chain Case doctrine.

Without analysis of the proofs submitted by defendants respecting the detail construction of their various machines, the conclusion seems irresistible that all embody the very construction for which Dillon was given credit in his patent, and that they infringe its various claims.

The contention that the reissue patent is invalid because of its inclusion of the last four claims is, in my judgment, unsound. Dillon, certainly, as against the present defendants, is entitled to liberality in respect of his disclosure in his original specifications. It cannot be urged that the Commissioner of Patents did not acquire and have jurisdiction to entertain the application for reissue. That is to say, it does not appear that there was not a proper showing of inadvertence or the like as a basis for entertaining the application. Nor is there a suggestion of laches during which intervening rights accrued which should bar exercise of the jurisdiction. Giving to his specifications and original claims the liberality to which they are entitled, the demonstration offered by complainant, respecting the coincidence of claims 6 to 10, with the invention or its parts disclosed in such original specifications, is entirely tenable. Computing Scale Co. v. Computing Scale Co., supra.

The plaintiff is entitled to a decree, adjudging the patent valid and infringed.